IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ANTHONY J. CARLIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:12-cv-333-TLW |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Anthony J. Carlis seeks judicial review of the decision of the Commissioner of the Social Security Administration, denying his claim for Disability Insurance Benefits (SSDI) and Supplemental Security Income benefits (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 26). Any appeal of this decision will be directly to the Tenth Circuit.

## Introduction

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750-752 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence, and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. at 1262. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d

1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 47-year old male, applied for Title II and Title XVI benefits on October 6, 2008, alleging a disability onset date of August 4, 2008. (R. 122-24, 125-31). Plaintiff's last insured date under Title II was determined to be September 30, 2010. (R. 12). Plaintiff initially alleged that he was unable to work due to "short term memory" problems. (R. 158). On a "Disability Report – Appeals" form, he noted he was "more forgetful – headaches are more frequent," and that he was "more depressed; short tempered; less desire to do much; anti-social." (R. 201). Plaintiff's claims for benefits were denied initially on February 11, 2009, and on reconsideration on May 14, 2009. (R. 58-65, 72-77). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 78-79). The ALJ held a hearing on February 11, 2010. (R. 22-52). The ALJ issued a decision on March 4, 2010, denying benefits and finding plaintiff not disabled if he stopped abusing alcohol. (R. 7-18). The Appeals Council denied review, and plaintiff appealed. (R. 1-5).

**The ALJ's Decision**

The ALJ found that plaintiff was insured through September 10, 2010, and had performed no substantial gainful activity since August 4, 2008, his alleged disability onset date. (R. 12). The ALJ also found that plaintiff had severe impairment of "R/O cognitive dysfuntion secondary to traumatic brain injury." Id. The ALJ noted records from Associated Centers for Therapy said plaintiff "might have Major Depressive Disorder with psychotic features," but relied on earlier records (in 2008) from Morton Comprehensive Health Services to say that plaintiff no longer was depressed. (R. 12-13). Using this reasoning, he found plaintiff's

depression to be a "medically nondetermined impairment." (R. 13). Plaintiff's impairments did not meet or medically equal a listed impairment. (R. 13-14).

The ALJ then reviewed the medical evidence, plaintiff's testimony, and other evidence to determine plaintiff's residual functional capacity. (R. 14-16). Plaintiff testified that he had suffered a brain injury after being struck by the mirror of a truck. He did not have surgery, but did experience swelling in the brain and fluids had to be drained. (R. 14). He was out of work for a year, and said when he returned to work, "he would forget what he was doing," and four years later, he began suffering blackouts and severe migraines. Id. Plaintiff's depression increased after the death of his wife, he started psychological counseling with Associated Centers for Therapy, and "[s]moking marijuana was also helpful." (R. 14). Plaintiff has only worked short-term odd jobs since his injury, leaving when his headaches became too intense or he was too stressed. He could sometimes go a week without a headache, but usually has 20 or more headaches a month. Id. He said when he experiences a headache, he feels faint, has to sit, then lie down and use an ice pack on his head. Id.

Plaintiff admitted to a prior drinking problem, and admitted that he still drinks two to three 24 ounce beers a day, but denied drinking hard liquor. (R. 14-15). He said he was not sure if drinking affected his headaches, but he agreed that drinking could affect his short term memory. (R. 15.) Plaintiff denied any current marijuana use, said he is a loner, and "being around people stressed him." Id.

The ALJ then reviewed plaintiff's medical records. He began by discussing David Hansen, Ph.D.'s December 8, 2008 psychological consultative evaluation of plaintiff. The ALJ noted Dr. Hansen did not have any prior records to review to provide him with a better understanding of plaintiff's condition. Dr. Hansen said the majority of plaintiff's answers to

4

interview questions, especially concerning his head injury, were "I don't know." Id. Plaintiff "never sought psychological treatment for his alleged 1988 brain injury or for the depression he felt after the deaths of his brother and his wife. He could not explain to Dr. Hansen why he had not sought such treatment." Id. The ALJ noted that Dr. Hansen's report concluded by saying the "legitimacy of [plaintiff's] affect and symptoms was difficult to determine 'in the presence of suspected response bias,'" because plaintiff's answers to the Folstein mini-mental exam were "highly atypical," and plaintiff's failure to provide details about his head injury was concerning. (R. 15).

The ALJ next discussed state medical consultant Carolyn Goodrich, Ph.D.'s opinions, noting the February 10, 2009 opinions were "generally in accord" with Dr. Hansen's. He discussed the limitations Dr. Goodrich said were "not significantly limited," and mentioned that she found plaintiff to have marked limitations with detailed instructions and getting along appropriately with the general public, but noted Dr. Goodrich opined plaintiff could adapt to a work setting. Id.

The ALJ impugned plaintiff's credibility, noting "[n]o treatment records address the claimant's alleged headaches or the short term memory loss that he claims is [sic] the basis for his disability claim." Id. The ALJ stated that plaintiff did not discuss any memory problems during treatment at Associated Centers for Therapy, instead discussing his "sadness and that sometimes he does not care about anything." Id. He said that plaintiff made no reference to his alleged memory problems on a form that "specifically asked for his psychological liabilities and weaknesses (Exhibit 11F, p. 15)." Id. The ALJ also used Dr. Hansen's reservations about plaintiff's symptoms, affect, and response bias to discount his credibility.

The ALJ ultimately said that plaintiff had not presented any "supportive evidence" to back up his subjective claims. The ALJ then analyzed opinion evidence, saying that "the above residual functional capacity assessment is supported by the Disability Determination Service's Mental Residual Functional Capacity Assessment (Exhibit 8F)." (R. 16).

Based on this evidence, the ALJ concluded that plaintiff would have the RFC to "perform simple tasks with routine supervision. He could relate to coworkers and supervisors on a superficial work basis. He could not relate to the general public, but could adapt to a work situation. He takes medications for his symptoms."[2] (R. 14).

The ALJ determined that with this RFC, plaintiff would be able to return to his past relevant work as a painter's helper, stating that the physical and mental demands of this work fit into the RFC based on testimony from the vocational expert. (R. 16). The ALJ made the alternative finding at step five that plaintiff could also perform the jobs of stock clerk (DOT 922.687-058), janitor (DOT 381.687-014), food service worker (DOT 311.472-010), and production inspector (DOT 559.687-014). (R. 17). Therefore, the ALJ decided that plaintiff was not disabled within the meaning of the Social Security Act. Id.

**Medical Records**

The pertinent medical records are those of plaintiff's treating physician at Associated Centers for Therapy, Dawn LaFromboise, M.D. (August 11, 2009 through January 13, 2010), a mental consultative examination performed by David Hansen, Ph.D. (December 8, 2008), and a PRT form and corresponding Mental RFC from non-examining agency physician Carolyn Goodrich, Ph.D. (February 10, 2009). (R. 344-364, 307-310, 312-325, 326-329).

---

[2] The ALJ did not present any exertional limitations in his decisional RFC. However, during the hearing, he proposed a hypothetical person with the above non-exertional limitations who could perform a full range of medium, light, and sedentary work. (R. 47). Neither party challenged the omission from the decisional RFC.

6

Dr. Hansen interviewed plaintiff and administered a Folstein Mini Mental Status Evaluation, stating plaintiff's "overall score was 19 out of 30." (R. 309). In his summary of his impressions, Dr. Hansen stated that plaintiff did not present any records of his alleged head injury, noting plaintiff had worked since 1988. Dr. Hansen continued, saying:

> His current clinical presentation is remarkable for suspected response bias with highly atypical and low frequency answers to the Folstein mini mental status exam. As well, he could not provide any substantive information regarding the nature or severity of his memory problems, in regard to any details or meaningful information regarding his head injury. In order to establish his cognitive functioning, neuropsychological evaluation including measures of response bias is recommended. Otherwise, he also reports depression. He exhibited a generally sullen mood and withdrawn interpersonal demeanor. Unfortunately, in the presence of suspected response bias, it is difficult to determine the legitimacy of his exhibited affect/symptoms. In regard to managing finances, until additional factual information is obtained regarding his cognitive functioning, it is not recommended he manage his own finances.

Id. Dr. Hansen's Axis diagnoses were (I) rule out response bias, rule out mood disorder not otherwise specified, rule out cognitive dysfunction secondary to reported traumatic brain injury in 1988; (II) no diagnosis; (III) traumatic brain injury, by report, in 1988, and hypertension. (R. 310).

Dr. Goodrich relied on Dr. Hansen's report, and evaluating plaintiff under section 12.02, Organic Mental Disorders, opined that plaintiff had moderate restriction in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (R. 322). She stated in her notes that plaintiff "may or may not have cognitive or psychiatric impairments." (R. 324). Dr. Goodrich subsequently completed a Mental RFC form, stating plaintiff was markedly limited in his ability to understand and remember detailed instructions, markedly limited in his ability to carry out any detailed instructions, and markedly limited in his ability to interact appropriately with the general public. (R. 326-27). She opined that plaintiff could perform simple tasks with routine supervision, relate to supervisors and peers on a

superficial work basis, adapt to a work situation, but could not relate to the general public. (R. 328).

Plaintiff first visited Dawn LaFromboise, M.D. of Associated Centers for Therapy on August 11, 2009 with complaints of depression. The record reflects that Dr. LaFromboise treated plaintiff through January 13, 2010. At his initial visit, plaintiff discussed growing up with an abusive father, the losses of his brother and his wife a year apart, feelings of extreme anxiety, auditory hallucinations, and problems with anger. Dr. LaFromboise noted plaintiff was given Klonopin for migraines by a doctor at OSU Medical, and that as a child he was diagnosed with ADHD and learning difficulties. (R. 363). Dr. LaFromboise did not perform any formal cognitive testing, but noted plaintiff's "affect appear[ed] depressed. Mood is ok. … Insight is limited." Id. Dr. LaFromboise diagnosed plaintiff at Axis I with post-traumatic stress disorder (PTSD), "rule out Obsessive Compulsive Disorder," "[h]e also has bereavement," and noted "[h]e probably meets criteria for Major Depressive Disorder with possible psychotic features." Id. At Axis III, she noted "[h]ypertension and migraines." (R. 364). She added Cymbalta to his prescriptions for depression and Seroquel to help him sleep. Id. At a follow up visit on August 25, 2009, plaintiff's mood was improved. Dr. LaFromboise increased his Seroquel but left the Cymbalta alone. (R. 362).

Dr. LaFromboise noted improvement at plaintiff's October 5, 2009 visit, stating he was "not crying like he did when I first met him. He is not hallucinating, and he is not suicidal or homicidal. Insight is better. Judgment is intact." Dr. LaFromboise increased his Cymbalta dosage, and added clonidine (to treat high blood pressure; also used to treat migraine headaches). (R. 347).

Notes from a "Comprehensive Treatment Plan" form dated October 20, 2009 shows depression, anxiety, and anger as problem areas, evidenced by "[s]adness 8/10 hours[,] has a bad attitude; worries daily[,] 7/10 hours feels down; doesn't want to be bothered daily 6/10 hours[,] ends up yelling at people." (R. 350). Further problems areas included obsessions, concentration, delusions, and hallucinations, evidenced by "[p]oor concentration daily 7/10 hours[,] trouble completing tasks; voices weekly 6/10[,] off/on gets migraines, forgets what to do; obsessively cleans daily 7/10 hours[,] inturupts (sic) life." Id. He was given an Axis V score of 50 on this form. (R. 356).

Plaintiff returned to Dr. LaFromboise on November 2, 2009, his Cymbalta was again increased, and clonidine was changed to Lisinopril for hypertension. (R. 346). He returned December 16, 2009, and Dr. LaFromboise noted his "[i]nsight [wa]s questionable," and added that his "paranoia might be related to his environment" to her usual diagnoses of PTSD, bereavement, possible Major Depressive Disorder with psychotic features, rule out obsessive compulsive disorder, hypertension, and migraines, which were assessed at every visit. (R. 345). Due to a blood pressure issue, Dr. LaFromboise exchanged Wellbutrin for the Cymbalta. Id.

At his January 13, 2010 follow up visit, plaintiff told Dr. LaFromboise that he had quit smoking, and quit drinking hard liquor. He stated he liked the Wellbutrin, but his headaches had increased and he was still depressed. Dr. LaFromboise noted his insight was questionable, his judgment intact, reduced his dosage of Wellbutrin, added Amitriptyline to "help[] with depression as well as sleep," and renewed his prescriptions for Seroquel (if needed), and Lisinopril. (R. 344).

**The ALJ Hearing**

The ALJ conducted a hearing on February 11, 2010. (R. 22-52). Plaintiff's attorney requested additional testing due to the lack of information in the record regarding plaintiff's head injury in the 1980s. The ALJ said he would take the request into consideration. (R. 25-26). Plaintiff testified that his birthdate was September 11, 1961, and that he was 48 years old at the time of the hearing. He said he is a widower with one child over the age of 18. (R. 26). He has a high school education, and took special classes and Ritalin for "LD." (R. 28).

Plaintiff discussed his accident in 1988, saying he was hit in the head by a truck mirror, knocking him unconscious. He received care at a hospital in San Antonio, Texas for approximately three weeks. He said doctors there did not perform surgery, but did insert a drainage tube to relieve pressure from brain swelling. (R. 29). Afterward, he did not work for about a year, and after his follow up treatment was finished, he still had issues of walking with a limp, and bruising "in my head." (R. 30).

Plaintiff stated that when he returned to work, he had the problems of "lose interest and forget what I'm doing," and noted that these issues became worse after his wife passed away. (R. 31). He also testified to migraine headaches and blackouts that started roughly four years after the accident. (R. 31).

Plaintiff discussed his depression, claiming to suffer from it since before his wife died, but admitted he did not seek treatment. He dealt with this depression by "smoking a lot of marijuana." (R. 32). He said he worked part-time at PeopleLink, going in when they called. He stated he missed about half the opportunities to work because he did not want to be around a lot of people. (R. 33). He claimed he could not complete an eight (8) hour day because of the pressure from supervisors. He also claimed his depression and headaches interfered with his

ability to work for PeopleLink. (R. 34-35). Plaintiff also said he had turned down some odd jobs due to his memory problems. (R. 37-38).

He stated his blood pressure was under control with medication, and he did not believe his headaches stemmed from high blood pressure, but from his accident in 1988. (R. 38-39). He said the only physical problem preventing him from working was the frequent migraines, stating he had about 20 migraines a month. (R. 39).

Plaintiff discussed his past drinking issues, admitted that he currently drinks about three 24 ounce beers a day, and denied current use of marijuana or any other drugs. (R. 43).

The ALJ next turned to the vocational expert, who defined plaintiff's past relevant work, then the ALJ gave her a hypothetical individual with a twelfth grade education, "a fair to good ability to read, write and use numbers," who could perform a full range of medium, light, and sedentary work. The ALJ included the non-exertional limitations that the person had the ability to perform simple tasks with routine supervision, could relate to coworkers and supervisors on a superficial work basis, but could not relate to the general public. This person would be able to adapt to a work situation "within these limitations and restrictions. He does take medication for relief of some of his symptomatology." (R. 47). Based on this hypothetical, the vocational expert said plaintiff could return to his past relevant work as a painter's helper only because the other vocations either dealt with the public or were too complex. Alternate jobs of janitorial work, food service worker, and production inspector were found at step five. (R. 48).

The vocational expert stated no conflicts existed with the DOT requirements of the work listed and the hypothetical presented. (R. 49). At the end of the hearing, plaintiff's counsel again requested an additional consultative exam, explaining that he had submitted a letter of request for additional testing that was not included in the file. (R. 51).

**Issues**

Plaintiff argues that the ALJ's decision should be reversed for the following four reasons:

1. The ALJ deprived [plaintiff] of his constitutionally protected right to due process by failing to make a full and fair inquiry and fully develop the record;

2. The ALJ failed to properly evaluate, consider, and weigh the medical evidence, and engaged in improper picking and choosing of evidence unfavorable to [plaintiff];

3. The ALJ's determinations at steps 2, 3, 4, and 5 of the sequential evaluation process failed because he did not properly consider and include all of [plaintiff's] impairments and their limitations; and

4. The ALJ failed to perform a proper credibility determination.

(Dkt. # 12 at 2).

## ANALYSIS

**Due Process**

Plaintiff argues that the ALJ did not provide a "full and fair hearing," and did not "fully and fairly develop the record as to material issues," stating that the medical evidence is inconclusive, and that "additional testing is necessary to explain a diagnosis already contained in the record," citing Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997). (Dkt. # 12 at 3). The Commissioner argues that "[t]he starting place for a duty to investigate must be the presence of some objective medical evidence in the record suggesting that some condition exists which could have a material impact on the disability decision; therefore, it requires investigation before the ALJ can arrive at a decision. See Howard v. Barnhart, 379, F.3d 945, 949 (10th Cir. 2004) (the claimant's obesity did not suggest further limitations requiring investigation)." (Dkt. # 18 at 2-3).

Plaintiff argues that he fulfilled his burden to "suggest a reasonable possibility that a severe cognitive impairment exists," including requesting additional testing at the hearing. (Dkt.

12

# 12 at 2-3). He states that the ALJ's own consultative examiner recommended additional testing, and that the non-examining agency physician "confirmed [that plaintiff] may or may not have cognitive or psychiatric impairments" as additional reasons an additional examination was needed. Id. The ALJ did not address the request from the hearing in his decision or rule on it at the hearing.

The Commissioner argues that "[a]lthough the ALJ accepted Plaintiff's 'R/O cognitive dysfunction secondary to traumatic brain injury' as a severe impairment, Plaintiff did not provide any evidence that would warrant further investigation." (Dkt. # 18 at 3). The Commissioner also offers the argument that "the medical evidence showed that plaintiff had no comprehension deficits, no brain damage or organic impairment, and no depression." (Dkt. # 18 at 5).

In his reply, plaintiff counters that the Commissioner presented *post hoc* arguments, and that evidence exists in the form of the consultative examiner stating that "'until additional factual information is obtained regarding his cognitive functioning, it is not recommended he manage his own finances.'" (Dkt. # 20). Plaintiff points out the Commissioner admitted that the ALJ's accepted severe impairment of R/O cognitive dysfunction secondary to traumatic brain injury is an "unusual description" and that "rule out" means evidence of the criteria for a diagnosis exists, but more information is needed. Id.

Social Security hearings are subject to procedural due process consideration. See Yount v. Barnhart, 416 F.3d 1233, 1235 (10th Cir. 2005). Also, an ALJ has the responsibility "in every case 'to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.'" Hawkins, 113 F.3d at 1164 (quoting Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993)); see also 20 C.F.R. §§ 404.944, 416.1444 (requiring the ALJ to look fully into issues); Social Security Ruling 96-7p, 1996 WL

374186, at *2 n. 3 (requiring the ALJ to develop "evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists"). Evidence exists that further testing is warranted to decide this case.

The ALJ's failure to further develop the record in this respect is reversible error. On remand, the ALJ is instructed to order another consultative examination to include the "neuropsychological evaluation including measures of response bias" recommended by consultative examiner Dr. Hansen to determine the extent of plaintiff's cognitive impairment. Since the due process violation is dispositive and further testing will likely affect the remaining allegations of error, the undersigned declines to analyze them.

## CONCLUSION

For the reasons set forth above, the decision of the Commissioner finding plaintiff not disabled is REMANDED.

SO ORDERED this 23rd day of July, 2013.

_____
T. Lane Wilson
United States Magistrate Judge